MICHAEL J. SCANLON, PLAINTIFF-RESPONDENT, v. GENERAL MOTORS CORPORATION, CHEVROLET MOTOR DIVISION AND I. J. DEMAREST, DEFENDANTS-APPELLANTS.

Argued March 4, 1974—Decided October 16, 1974.

584

*Mr. Carroll A. Morley* argued the cause for defendant-appellant General Motors Corporation, Chevrolet Motor Division *(Messrs. Morley, Cramer, Tansey and Haggerty,* attorneys; *Mr. Morley,* of counsel).

*Mr. Norman S. Karpf* argued the cause for defendant-appellant I. J. Demarest *(Messrs. Morgan, Melhuish, Monaghan, McCoid and Spielvogel,* attorneys; *Mr. Karpf* of counsel).

*Mr. Robert D. Curran* argued the cause for plaintiff-respondent *(Messrs. Vaccaro & Osborne,* attorneys; *Mr. Curran,* of counsel).

The opinion of the Court was delivered by

CLIFFORD, J. This products liability case calls upon the Court further to explicate the nature and *quantum* of proof necessary to establish the elements of a defect existing in the hands of the manufacturer and retailer in an action for personal injuries resulting from a vehicular accident, based on strict liability in tort. Procedurally, the case comes here this

way: the trial judge granted defendants' motions for judgment at the close of all the evidence; the Appellate Division, in an unreported opinion, reversed and remanded for a new trial; and we granted defendants' petitions for certification, 64 *N. J.* 311 (1973). Our approach to the problem requires a review of the evidence in some detail.

In mid-July 1968, defendant I. J. Demarest, a Chevrolet dealership (hereinafter Demarest), delivered a new Chevrolet Impala nine-passenger station wagon to plaintiff, Michael Scanlon. After delivery the automobile was serviced twice by Demarest, on October 18, 1968 and February 25, 1969. On the latter date the odometer indicated the vehicle had been driven 2,995 miles.

On Saturday, March 29, 1969 plaintiff, a resident of Westwood, New Jersey, drove the station wagon with his brother-in-law, Sean Rogan, as a passenger, to the Bronx, New York, to buy some wood paneling for the Scanlon home. They were on the return trip to plaintiff's house at 4:30 P.M. when the accident occurred on Forest Avenue, a four lane north-south roadway in Emerson, New Jersey. It was still daylight, the weather was clear, and the asphalt roadway was dry.

Plaintiff testified that he was traveling northbound at about 25 miles per hour. Immediately prior to the accident he had his foot on the brake while going down a slight decline. The station wagon was in the left or fast lane and was passing a slow-moving car in the right lane. At the bottom of the downgrade where the road levels out, plaintiff took his foot off the brake and gave the engine some gas. He described the results as follows:

At the time I put my foot on the accelerator and increased speed, the station wagon just took off at an awful pace. It went crazy. I used the word. And I immediately applied my brake. The rubber was burning on the car. I could smell the tires. And I travelled 560 feet and wound up hitting a pole.

The vehicle swerved from the northbound fast lane across the southbound fast and slow lanes and went partially onto

the sidewalk. It then came back across the four lanes and collided with a telephone pole off the northbound lanes on the east side of the roadway.

Plaintiff said that when he depressed the accelerator approximately 25% of the way to the floor, the station wagon "took off like a jet" and "started to go erratic." He estimated it was traveling at least 50 to 60 miles per hour even though he had applied the brakes and they were making noise. The vehicle picked up speed until it was stopped by the collision with the pole.

Plaintiff stated that he did not think he turned the steering wheel to the left. When pressed by defense counsel as to how the station wagon went in that direction, Scanlon replied:

> Because it was going at such a fast pace and the car wouldn't stop for me, and I got scared, I guess, and lost control of it.

However, he admitted that after the accident he did not mention any malfunction of the vehicle in describing the occurrence to the investigating police officer whom he told he had simply lost control. Likewise, no mention of anything being wrong with the station wagon was made to Demarest, the seller, upon a return visit some six months later.

At the time of the accident plaintiff estimated that the nine-month old vehicle had traveled approximately 4000 miles. His wife was the principal operator. While he maintained that the only adjustments made on the car were done by the dealer, Demarest, counsel stipulated that plaintiff could not testify as to whether his wife had ever had the carburetor adjusted by the gas station where they traded. Mrs. Scanlon was not called as a witness.

The passenger's version of the details of the accident was basically consistent with that of the plaintiff.

Jesse Fisher, an expert witness called by plaintiff, never examined the Scanlon station wagon or any of the parts thereof. Consequently, his testimony as to the existence of

a defect was limited largely to responses to hypothetical questions. In Fisher's opinion the plastic fast idle cam in the carburetor "broke, and that jammed the carburetor linkage in such a way that the carburetor would not respond when the driver took his foot off the gas pedal and the engine ran away." The result, he believed, would be to "hold the accelerator open only to the point the accelerator was at the time this phenomena occurred." In other words if plaintiff had depressed the accelerator 25% when the plastic piece became lodged, the linkage would be jammed so that no greater than 25% of the flow capacity of the carburetor could be called into use. The expert offered no hypothesis as to how or why the plastic cam broke and in fact never said in so many words that it was defective, although that was the purport of his testimony. He conceded that a photograph of what was said to be the cam in question showed it to be intact and unbroken, the clear inference being that if indeed that photograph accurately represented the cam in question, his opinion of the accident's cause would fall with the collapse of the hypothesis upon which it was based.

On defendant's case evidence was introduced establishing a chain of possession of the cam in question. Through photographic evidence, including the photograph used in cross-examining plaintiff's expert and the cam itself, there was proof that it was the original equipment on the station wagon rather than a replacement, and that it was "intact, undamaged, and in one piece" after the accident. The owner of the body shop which had purchased the wrecked station wagon and repaired it (but had done nothing by way of repair to the carburetor) said he drove the vehicle himself for about a week after it had been fixed and it operated "all right." Depositions of the unavailable police officer revealed the existence of tire marks on the road tracing the erratic course of the station wagon, and confirmed plaintiff's statement to the effect that he "lost control" of the vehicle.

. As indicated above, it was in this posture of the proofs that judgment was entered for defendants on their motions,

reversed by the Appellate Division, and the case is here by our grant of certification, *R.* 2:2–1(b).

## I

The doctrine of strict liability in tort is firmly established in the law of this state. See, *e. g., Henningsen v. Bloomfield Motors, Inc.,* 32 *N. J.* 358 (1960); *Santor v. A & M Karagheusian, Inc.,* 44 *N. J.* 52 (1965); *Schipper v. Levitt & Sons, Inc.,* 44 *N. J.* 70 (1965); *Cintrone v. Hertz Truck Leasing & Rental Service,* 45 *N. J.* 434 (1965); *Rosenau v. City of New Brunswick and Worthington Gamon Meter Co.,* 51 *N. J.* 130 (1968); *Realmuto v. Straub Motors, Inc.,* 65 *N. J.* 336 (1974). Under this doctrine manufacturers and retailers are liable for damages if the product left their hands in a defective condition proximately causing the mishap. Thus, a plaintiff in a strict liability case must establish that the product was defective, that the defect arose while in the control of the defendant,[1] and that the plaintiff suffered injury thereby. See *Jakubowski v. Minnesota Mining & Manufacturing,* 42 *N. J.* 177 (1964); *Newmark v. Gimbel's Incorporated,* 54 *N. J.* 585 (1969); *Corbin v. Camden Coca-Cola Bottling Co.,* 60 *N. J.* 425 (1972); *Prosser, Law of Torts* (4th ed. 1971) § 103.

----

[1]Dean Keeton has stated that "* * * the holdings of the court, on this subject, although often in conflict, are of far more importance than the substantive doctrines of strict liability in contracting or expanding the liability of makers or products." P. Keeton, "Manufacturer's Liability: The Meaning of 'Defect' in the Manufacture and Design of Products," 20 *Syracuse L. Rev.* 559 (1969). See Rheingold, "Proof of Defect in Product Liability Cases," 38 *Tenn. L. Rev.* 325 (1971); Note, "Proof of Defect in a Strict Products Liability Case," 22 *Maine L. Rev.* 189 (1970). Quite obviously, there is a dual purpose to the continuing effort clearly to define the nature and burden of proof in this area. Courts must concern themselves with both weeding out frivolous claims and insuring that cases are sent to a jury where a reasonable man could find that a defect existed while the product was in the control of the manufacturer. See generally, Note, "Products Liability and the Problem of Proof," 21 *Stan. L. Rev.* 1777, 1786 (1969).

 A product is defective if it is not fit for the ordinary purposes for which such articles are sold and used. *Santor v. A & M Karagheusian, Inc., supra,* 44 *N. J.* at 66–67; see *Collins v. Uniroyal, Inc.,* 64 *N. J.* 260, 271–272 n. 6 (1974) (dissenting opinion). Establishing this element requires only proof, in a general sense and as understood by a layman, that "something was wrong" with the product. As a rule the mere occurrence of an accident is not sufficient to establish that the product was not fit for ordinary purposes. However, additional circumstantial evidence, such as proof of proper use, handling or operation of the product and the nature of the malfunction, may be enough to satisfy the requirement that something was wrong with it.[2] See, *e. g., Henningsen v. Bloomfield Motors, Inc., supra,* 32 *N. J.* at 409 (steering malfunction); *Cintrone v. Hertz Truck Leasing & Rental Service, supra,* 45 *N. J.* at 452 (brake failure); *Sabloff v. Yamaha Motor Co., Ltd.,* 113 *N. J. Super.* 279, 286–287 (App. Div.), aff'd 59 *N. J.* 365 (1971) (wheel locked). Further, a defective condition can also be proven by the testimony of an expert who has examined the product or who offers an opinion on the product's design.

 However, it is not enough for plaintiff merely to establish that something was wrong with the product and that an accident thereby resulted. He must, in addition, satisfy the requirement that the defect was present while it was in the control of the particular defendant being sued. Such proof has been made an explicit element of an action in strict liability in tort. See *Jakubowski v. Minnesota Mining & Manufacturing, supra,* 42 *N. J.* at 182. This hurdle is the more difficult obstacle for plaintiff to overcome. See *Prosser, Law of Torts* (4th ed. 1971) § 103, p. 674.

---

[2] See Prosser, "The Fall of the Citadel (Strict Liability to the Consumer)," 50 *Minn. L. Rev.* 791, 842 (1966); Rheingold, "Proof of Defect in Product Liability Cases," 38 *Tenn. L. Rev.* 325 (1971) and Note, 50 *N. C. L. Rev.* 417 (1972) for discussion of this problem.

 In *Jakubowski* Justice Proctor outlined the three methods by which a plaintiff can prove an instrumentality's defective condition while in the control of the manufacturer.[3]

> While a manufacturer is liable on its warranty irrespective of negligence, nevertheless it is necessary for the plaintiff to show that the dangerous condition which he contends constitutes a breach of warranty had its genesis when the instrumentality was within the control of the manufacturer. Accordingly, in the absence of direct evidence that the product is defective because of a manufacturing flaw or inadequate design, or other evidence which would permit an inference that a dangerous condition existed prior to sale, it is necessary to negate other causes of the failure of the product for which the defendant would not be responsible, in order to make it reasonable to infer that a dangerous condition existed at the time the defendant had control. [42 *N. J.* at 183–184]

A brief discussion of the nature of each approach seems appropriate here.

## II

 An expert's opinion that a product's design was defective by its very nature establishes that the defect arose while in the control of the manufacturer. See Note, "Products Liability and the Problem of Proof," 21 *Stan L. Rev.* 1777, 1782 (1969); *cf. Harper & James, Law of Torts* (1956) § 28.14, p. 1564. In the case of a production defect, as distinguished from one of design, direct evidence that the defect arose in the hands of the manufacturer will be rare, since generally it would require the testimony of someone who was present and examined the product at the time of production.

 In addition to the direct evidence device a plaintiff may establish the manufacturer's responsibility for a defect by means of "other evidence which would permit an infer-

---

[3] Proof that a product was defective while in the control of the manufacturer also establishes that it was defective while in the control of the retailer. However, the converse obviously is not true.

ence that a dangerous condition existed prior to sale," *Jaku-bowski v. Minnesota Mining & Manufacturing, supra*, 42 *N. J.* at 184. Basically, the age and prior usage of the product in relation to its expected life span, durability and effective operability without maintenance are the most important considerations in determining whether an inference is permissible that the defective condition existed prior to sale.

Generally speaking, the older a product is, the more difficult it is to prove that a defect existed while in the control of the manufacturer. No product is intended to last indefinitely and many products require care and maintenance to perform at the same level as they did when new. With many products proof that the defect arose while in the hands of the manufacturer becomes very difficult, if not impossible, after a certain age; however, in certain situations mere age alone may not be sufficient to preclude an inference of a defect existing in the hands of the manufacturer. The product itself must be of a type permitting the jury, after weighing all the evidence and particularly the other factors referred to in the preceding paragraph, to infer that in the normal course of human experience an injury would not have occurred at this point in the product's life span had there not been a defect attributable to the manufacturer.[4]

Under *Jakubowski* a plaintiff who cannot prove that the defect arose while in the control of the defendant by direct evidence or by circumstances which justify such an inference has available still a third approach: he must "negate other causes of the failure of the product for which the defendant would not be responsible, in order to make it reasonable to infer that a dangerous condition existed at the

---

[4]In an appropriate case, proof that the manufacturer is responsible for the defect may be established by circumstantial evidence without reference to the product's age. For example, where specifically identified, the nature of such a defect may justify the inference that it was present while in the manufacturer's control. However, this would be the exception rather than the rule, the product's age being of considerable significance.

time the defendant had control." 42 *N. J.* at 184. Depending upon the complexity of the product, this type of proof may require the testimony of an expert witness as to the various possible explanations for the mishap. His opinion as to the nature of the defect will implicitly result in the negation of other causes, either through the statement of the hypothetical or by means of his answer discounting alternative explanations for the accident. Moreover, his answer would do well to include a discussion of any other possible mechanical causes which he has discounted in reaching his conclusion as to the identity of the defect. In the case of relatively simple products, such as the carton in *Corbin v. Camden Coca-Cola Bottling Co. Inc., supra,* or the disc in *Jakubowski v. Minnesota Mining & Manufacturing, supra,* expert testimony would not be necessary since a layman can readily comprehend the possible alternative causes of the accident. To make out a case by negating other causes of a product's failure it is not necessary that all possible causes be negated by the plaintiff. What is required is that the most likely causes were not in fact responsible for the accident. *Cf. Corbin v. Camden Coca-Cola Bottling Co., supra; Prosser, Law of Torts* (4th ed. 1971) § 103, p. 675.

## III

An analysis of the New Jersey cases sheds further light on what constitutes proof of a defect while in control of the manufacturer under the *Jakubowski* tests. In *Bexiga v. Havir Manufacturing Corp.,* 60 *N. J.* 402 (1972) and *Finnegan v. Havir Manufacturing Corp.,* 60 *N. J.* 413 (1972) the opinion of the experts that the design of a power punch was unreasonably dangerous constituted direct evidence that the defect existed while in the control of the manufacturer.

*Henningsen v. Bloomfield Motors, Inc., supra,* and *Sabloff v. Yamaha Motor Co., Ltd., supra,* are examples of cases in which the newness of the product justified an inference that the defect arose while in the control of the manufacturer.

*Henningsen* involved an eleven-day old car with 468 miles on the odometer and *Sabloff* a three-day old motorcycle driven 116 miles. In both these cases it was reasonable to infer from age and prior usage of the product (given the nature of the product in question) that the manufacturer was responsible for the defect.[5] Likewise in *Realmuto v. Straub Motors, Inc., supra,* plaintiff drove the used car only five days and about 104 miles before the malfunction of that part of the car which the dealer had repaired.[6]

On the other hand, our case law also shows that the fact that a product is relatively new does not always suffice, in and of itself, to establish a defendant's responsibility for the defective condition. *Jakubowski v. Minnesota Mining & Manufacturing, supra,* was a case where the very short expected life span of the product (an abrasive disc intended for five operations) precluded a finding that it was defective when it left the control of the manufacturer. Consequently, this Court required a plaintiff in that situation to negate the other possible causes of misuse or overuse of the product. Likewise, in *Corbin v. Camden Coca-Cola Bottling Co.,*

---

[5]In *Sabloff*, because a brand new motorcycle was involved, the attribution of the defect was clear once it was held that the manufacturer could not avoid strict liability by delegating the initial servicing of the vehicle to its authorized dealer. The brief *per curiam* opinion spoke only to proof of the existence of a defect, *i. e.*, something wrong with the product. *Cf. Corbin v. Camden Coca-Cola Bottling Co., supra,* 60 *N. J.* at 431. It did not discuss whether that defect arose while in the control of the manufacturer because the newness of the product precluded that from being a serious issue in the case. *Sabloff* in no way was meant to remove or lessen plaintiff's burden of proving that the defect arose while in the control of the defendant.

[6]*Cintrone v. Hertz Truck Leasing & Rental Service, supra,* implicitly lies within the category of new products, although nowhere discussed in that opinion, because of the special continuing nature of the warranty accompanying a rented chattel. Since *Cintrone* held that the warranty continues for the period of the rental regardless of any servicing agreement, the bailor had the obligation to keep the vehicle in the same condition at any given time during the rental as it was on the first day of the rental.

*supra,* the nature of the product and its high degree of susceptibility to outside forces again precluded a finding of the manufacturer's responsibility for the defect and plaintiff was required to negate the possible causes of mishandling by the retailer. Both *Jakubowski* and *Corbin* are examples of products which are simple enough to obviate the necessity for expert testimony as an aid to the jury's comprehending the possible alternative causes of the accident.

## IV

Turning to the instant case we take momentary departure from the direction of our discussion thus far to observe that the trial court's grant of defendants' motions could be sustained simply on the theory that plaintiff failed completely to make out a jury question as to the existence, in the hands of the manufacturer, of the specific defect alleged. The complaint in this case attributes the accident to "a certain defect in the throttle and carburetor." The entire theory of the case, through discovery, pretrial, and the trial, was that there was a single and specific defect. In the words of plaintiff's attorney at trial, "[I]t's our position it was our fast idle cam that was defective."

As indicated in the recitation of facts earlier in this opinion, that theory was based upon a conclusion given by an expert in response to hypothetical questions. Plaintiff's expert maintained the station wagon went out of control because the accelerator remained depressed by reason of the cam breaking, thus jamming the throttle linkage; put differently, support for the conclusion of a broken cam was found in the evidence that the accelerator was depressed and the car went out of control. But that conclusion was rendered entirely untenable by the photographs showing the fast idle cam to be whole and unbroken and by the intact cam itself. True, plaintiff did not concede that the cam and photographs thereof produced by defendants accurately represented the specific cam removed from the Scanlon vehicle

after the accident, but there was no evidence whatsoever to shed doubt on the validity of those exhibits. The absence of a concession is of no significance under the circumstances. The cam introduced in evidence, referred to as "original equipment," was identified by defendants' expert as factory installed by reason of both its tan color and the part number described thereon. At the close of all the evidence the factual basis for the expert's opinion demonstrably did not exist; and the theory upon which the plaintiff exclusively relied was therefore destroyed.

While the expert's testimony would have permitted the case to survive a defense motion at the conclusion of plaintiff's presentation of evidence under *R.* 4:37–2(b), it does no violence at all to the sound proposition of *Dolson v. Anastasia,* 55 *N. J.* 2, 5 (1969), to conclude, as we do, that in the posture of the proofs at the end of the entire case there was nothing to go to the jury and defendants' motions under *R.* 4:40–1 were properly granted. Unlike the garden variety of cases wherein the facts are disputed and the benefit of all favorable inferences reasonably to be drawn from the evidence will be given, for motion purposes, to the party opposing the motion, with the jury rendering a conclusion through its verdict in favor of the party whose evidence on those disputed facts it finds more persuasive, no such dispute is discernible here. As the uncontradicted photographs illustrate, there was no broken fast idle cam. No judgment in favor of the plaintiff could be sustained on a record revealing the complete collapse of the factual predicate of plaintiff's theory. Nor does *Dolson* compel the contrary. The acceptance as true of all evidence supportive of plaintiff's position and the favorable inferences legitimately deduced therefrom does not mandate the acceptance of a proposition on which reasonable men could not differ. See *Harvey v. Craw,* 110 *N. J. Super.* 68 (App. Div. 1970), certif. den. 56 *N. J.* 479 (1970); *cf. Platt v. New Irvington Hotel of Lakewood, Inc.,* 85 *N. J. Super.* 330, 338–339 (App. Div. 1964); see also *Ferdinand v. Agricultural Ins. Co. of Watertown, N. Y.,* 22 *N. J.* 482,

494 (1956); *Caliguire v. City of Union City,* 104 *N. J. Super.* 210, 217–219 (App. Div. 1967), aff'd o. b. 53 *N. J.* 182 (1969).

Plaintiff argues, however, that *Sabloff v. Yamaha Motor Co. Ltd., supra,* 59 *N. J.* at 366, frees him from the strictures of the explanation for the accident advanced by his expert. While it is true, as a general proposition, that such flexibility now would be allowed both in terms of proof and theory of the case, the fact here is that plaintiff undertook voluntarily to confine himself. The Supreme Court opinion in *Sabloff* was handed down about six weeks after the trial of this case. Here the plaintiff's case was predicated upon a single and specific defect; that is the case defendants had every reason to believe they were defending against; and that is precisely the theory upon which the trial proceeded. Under these circumstances plaintiff cannot now be heard to argue for reversal on a question foreign to the initial proceedings. See *Schwartz v. Rothman,* 1 *N. J.* 206, 210–211 (1948); *Domestic Fuel Co. v. American Petroleum Corp.,* 6 *N. J.* 538, 545 (1951); *State v. Rios,* 17 *N. J.* 572, 599 (1955); *Stoelting v. Hauck,* 32 *N. J.* 87, 99 (1960).

But we did not grant certification to decide this case upon such a narrow issue. As indicated by the first sentence of this opinion, our concern is more far-reaching. That concern prompts us to demonstrate that the result is the same on application of the principles heretofore discussed, specifically, that by resort to the *Jakubowski* tests reconfirmed here and by application of the *Sabloff* doctrine that permits plaintiff to go beyond his expert's theory, nevertheless the proofs were insufficient to create a jury question.

Plaintiff introduced evidence that the station wagon malfunctioned violently while being properly operated by him. This was sufficient to permit a finding that the vehicle was defective at the time of the accident.[7] See *Hen-*

---

[7]We note that it was the defendant manufacturer who produced the product at trial. Ordinarily, it would be expected that production

*ningsen v. Bloomfield Motors, Inc., supra,* 32 *N. J.* at 409; *Cintrone v. Hertz Truck Leasing & Rental Service, supra,* 45 *N. J.* at 452; *Sabloff v. Yamaha Motor Co., Ltd., supra,* 113 *N. J. Super.* at 286; *Corbin v. Camden Coca-Cola Bottling Co., supra,* 60 *N. J.* at 431. However, this did not end plaintiff's burden with regard to the product itself. He still had to show that the defective condition existed while in the control of the defendants. See *Jakubowski v. Minnesota Mining & Manufacturing, supra,* 42 *N. J.* at 182.

Plaintiff introduced no direct evidence that this defective condition existed while the vehicle was in the control of either defendant. He also failed to introduce "other evidence which would permit an inference that a dangerous condition existed prior to sale," *Jakubowski v. Minnesota Mining & Manufacturing, supra,* 42 *N. J.* at 184. A motor vehicle is not a simple uncomplicated instrumentality. Its parts require periodic maintenance, minor adjustments and occasional major repairs or replacements. A nine-month old station wagon with 4000 miles on it is not the kind of product as to which human experience tells us an accident such as the one in question does not generally occur in the absence of a defect existing in the hands of the manufacturer. Relating its expected life span, durability and effective operability without maintenance to the age and prior usage of the Scanlon vehicle, we hold as a matter of substantive law that in the circumstances of this case the "other evidence" offered does not justify the drawing of an inference that any defect existed in the hands of the manufacturer or retailer.

of the allegedly offending instrumentality would support plaintiff's position. Therefore, where it would be reasonable under all the circumstances for plaintiff to have produced the product which is claimed to suffer from a defect in the hands of defendant and plaintiff has failed to produce it or to offer any explanation or otherwise justify his failure to have done so, then the trier of fact is free to draw an adverse inference as to the existence of any defect. See *Brownell v. White Motor Corp.*, 260 *Or.* 251, 490 *P.* 2d 184, 187 (Sup. Ct. 1971); *McCormick, Evidence* (2d ed. 1972) § 272, p. 656.

It is equally clear that plaintiff failed to prove the defendants' responsibility for the defect by the negation of the other most likely possible causes of the accident. He attempted to do so by means of the testimony of an expert who had not examined the product and who testified in response to a hypothetical question. Quite properly, that hypothetical question contained within it an asserted negation of several possible alternative causes of the accident which would be obvious to a layman, *i. e.,* the car was not properly maintained and operated. But assuredly other possible causes existed, and given the complex nature of the product, plaintiff should have been required further to outline and discount the most likely of these in focusing upon the specific defect which he embraced.

As it was, plaintiff did not sufficiently negate even the possible alternative causes which he posed in his hypothetical. Specifically, he failed to establish that the defective condition was not the result of faulty maintenance. He showed that the vehicle was serviced twice by the defendant dealer, Demarest, and plaintiff testified that to the best of his knowledge no one adjusted the carburetor. However, he admitted that his wife was the principal driver. Her failure to appear as a witness to testify to the vehicle's maintenance was unexplained. *Jakubowski* requires at least that much, if not the testimony of the owner of the service station where they customarily traded, to negate the most likely possible alternative cause of improper maintenance. Alternatively, a subpoena of the station's records might have been sufficient to establish that no work was done on the carburetor by its employees. In this case improper maintenance or adjustment were conspicuous factors to be negated as most likely possible causes of malfunction. We conclude that those factors were not sufficiently negated to justify an inference that a defect existed while in the control of the defendants.

We are not here concerned simply with weaknesses or mere shortcomings in plaintiff's case or the undermining of inferences to be drawn from the evidence. Rather our concern is

with the essential ingredients of a strict liability case. Those ingredients being absent from this record, the defense motions were properly granted.

## V

The judgment of the Appellate Division is hereby reversed and the judgment of the trial court in favor of defendants reinstated.

PASHMAN, J. (dissenting). In this case, the trial judge granted defendants' motion for judgment at the close of all the evidence, thereby defeating plaintiff's action based on strict liability in tort. This review is concerned with the propriety of that ruling.

Pursuant to *R.* 4:40–1, the court must accept as true all the evidence which supports the position of the party (plaintiff herein) defending against the motion and must accord him the benefit of all legitimate inferences which can be deduced therefrom. If reasonable minds could differ, the motion must be denied. *Sabloff v. Yamaha Motor Co., Ltd.,* 113 *N. J. Super.* 279, 281 (App. Div.), aff'd 59 *N. J.* 365 (1971); *Dolson v. Anastasia,* 55 *N. J.* 2, 5 (1969).

According to the majority's recitation of claimant's case, the following factual scenario unfolds. Plaintiff purchased a new station wagon from defendant dealer in July 1968 and had the automobile serviced by the dealer in October 1968 and February 1969, at which time the vehicle had been driven only 2995 miles. After approximately 1,000 additional miles, the bizarre accident occurred resulting in this litigation.

Plaintiff was traveling at about 25 miles per hour in the left northbound lane of a four-lane asphalt roadway. The weather was clear and the road was dry. After going down an incline with his foot on the brake pedal, plaintiff depressed the accelerator approximately 25% of the way to the floor. He was in the process of passing a slower moving vehicle. His car then "took off at an awful pace" and "started to go

erratic." The brakes failed to slow the vehicle which achieved a speed of at least 50 to 60 miles per hour. The vehicle swerved from the left northbound lane across both southbound lanes, going partially onto the sidewalk, swerved back across the entire roadway and collided with a telephone pole east of the northbound side of the highway. The vehicle left skidmarks measuring 563 feet.

Plaintiff's expert witness, Jesse Fisher, advanced a theory of the accident in response to hypothetical questions. He testified as to his familiarity with the type of carburetor on plaintiff's car and that it has "had a problem." He did not examine the actual carburetor on plaintiff's vehicle. The defect alleged in his report was that the plastic fast-idle cam "broke and jammed the carburetor linkage" so that the accelerator remained open. In testifying, Mr. Fisher noted that something "had to go wrong in that acceleration mechanism of that vehicle." This remark, however, was stricken from the record in limiting Mr. Fisher to the specific theory of defect alleged in his pretrial report. On cross-examination, he testified that the throttle could be jammed open only to the extent that it already was open at the time the cam broke.

The thrust of General Motors' defense was to show not only that the plastic fast-idle cam was in one piece subsequent to the accident, but also that the cam in plaintiff's vehicle was original equipment. The owner of Acme Auto Repairs, purchaser of the damaged automobile, testified that there was no repair work on the carburetor, although he did not work on the car himself and did not produce records as to what was done before the car was sold to a John Rittweger. One Lloyd Dimm testified that at this time, he examined the vehicle and found the cam to be in one piece. This cam was subsequently removed from the vehicle and produced in court.

For our purposes, in reviewing the grant of a motion for judgment, it is of no significance that the answers to plaintiff's hypothetical questions may have been refutted by defendants' expert. Before either Mr. Fisher or Mr. Dimm testified, the court instructed the jury that the weight and credibility

to be given their testimony remained with the jury. As this Court specifically pointed out in affirming *Sabloff, supra,* so long as "the facts permit an inference that the harmful event ensued from some defect (whether identifiable or not) in the product, the issue of liability is for the jury, and the plaintiff is not necessarily confined to the explanation his expert may advance." 59 *N. J.* at 366. That plaintiff herein advanced a theory refuted by defendants does not preclude him from having a jury pass upon his claim if the facts and all legitimate and reasonable deductions therefrom may still allow reasonable men to differ. That is why we reversed the trial judge who took the case from the jury on a motion under *R.* 4:40–1 and ordered a new trial in *Sabloff.*

The majority notes that the Court "did not grant certification to decide this case upon such a narrow issue" as to whether *Sabloff, supra,* came too late for plaintiff's benefit, having been decided six weeks after the trial below. They then proceed to do just that by binding plaintiff to his expert's explanation of the accident under the guise that plaintiff "undertook voluntarily to confine himself."

The facts as set forth by plaintiff and the majority include a vehicle being subjected to sudden uncontrolled acceleration, ineffective heavy braking, and uncontradicted evidence of extensive skid marks. The majority points out various shortcomings in plaintiff's case: the vehicle had been driven 4,000 miles; plaintiff may not have had exclusive control of vehicle maintenance in that his wife was the principal driver; plaintiff admittedly could not testify as to whether his wife had ever had the carburetor adjusted; and plaintiff did not negate other possibilities for causes of the accident. While these factors may partially undermine the inferences which reasonable men may draw from the behavior of the car and the skid marks, they do not serve to deprive plaintiff of a jury determination. The majority took these facts and inferences together with the experts' testimony and concluded that plaintiff's theory "was so destroyed by the end of the case as to leave nothing to go to the jury." This was an unwarranted

factual finding on the part of the trial judge and the majority.

Our concern is not the ultimate conclusion to which each of us may come after reviewing plaintiff's factual proofs to show the elements of a strict liability action. That the absence of the wife's testimony could be considered "fatal to plaintiff's case" or that plaintiff could have subpoenaed service station records, indicates what plaintiff might have done differently to make a stronger case, but are irrelevant in deciding whether or not the case goes to the jury. It is not for this Court to decide how a case could be more convincingly presented. Our focus in considering a motion for judgment pursuant to *R.* 4:40–1 by defendants herein is essentially whether plaintiff's position and all reasonable inferences therefrom allow reasonable men to differ. I strongly believe there is a substantial area of difference. It is the jury which passes on what "human experience tells us" as to why an accident such as this occurred, given whatever ambiguities and gaps exist in a plaintiff's case. That defendant's case is stronger or that plaintiff's case is inconclusive or, at best, weak, does not justify taking a case from the jury.

On one hand the majority states that an automobile "is not a simple uncomplicated instrumentality." Yet this very complexity then serves as the majority's basis for requiring plaintiff consumer to outline other possible causes of the accident. The more liberal and modern view of finding liability in favor of a purchaser of a mass-produced article who is injured in its use, *Sabloff, supra,* 113 *N. J. Super.* at 287, is incompatible with an assertion that given the complexity of the product, it is the consumer who must "outline the various possible mechanical causes for the accident." This Court's holding in *Sabloff* is to the contrary.

In a strict liability action, plaintiff must show that the defect or dangerous condition originated when the instrumentality was in the manufacturer's control. This can be accomplished by direct evidence that the product is defective because of a manufacturing flaw, or by other evidence per-

mitting such an inference, or by negating other causes of product failure. *Jakubowski v. Minnesota Mining and Mfg. Co.*, 42 *N. J.* 177, 184 (1964). We are not faced here with merely the happening of an accident. Sudden uncontrolled acceleration followed by heavy brake application and 563 feet of skid marks surpass "mere surmise or conjecture." *Jakubowski, supra* at 182. These undisputed facts are consistent with a product defect and more than sufficient to support a finding by a jury in strict liability. There is ample evidence permitting an inference that a dangerous condition existed prior to sale, while the automobile was under the manufacturer's control. Plaintiff need not negate other possible causes of the accident, even though doing such would strengthen his position. Cases are not taken from juries because they could have been more forcefully presented. Weakness in plaintiff's case and factors favorable to the defense are for the jury to evaluate as to weight and credibility.

Many years passed before courts held the manufacturer strictly liable for his product thereby relieving a plaintiff from the necessity of proving negligence in the making of that product. Realizing that the leverage of the automobile manufacturers on the consumer was enormous, this Court ushered in the era of protection to the public against the manufacture and sale of defective products. *Henningsen v. Bloomfield Motors, Inc.*, 32 *N. J.* 358 (1960). Two and one-half years after taking such an additional timely step forward in *Sabloff*, this Court should continue in its support of the liberal and modern view favoring a jury trial for a purchaser injured in the use of a mass-produced article.

I would affirm the judgment of the Appellate Division and order a new trial.

*For reversal*—Chief Justice HUGHES and Justices JACOBS, SULLIVAN and CLIFFORD—4.

*For affirmance*—Justice PASHMAN—1.