

Villanova University School of Law Digital Repository

2006 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

9-6-2006

# Estate Knoster v. Ford Mtr Co

Precedential or Non-Precedential: Non-Precedential

Docket No. 05-3355

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2006

## Recommended Citation

"Estate Knoster v. Ford Mtr Co" (2006). *2006 Decisions.* Paper 481.
http://digitalcommons.law.villanova.edu/thirdcircuit_2006/481

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2006 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

**NOT PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 05-3355
_____

ESTATE OF EDWARD W. KNOSTER, by IRENE KNOSTER as Administratrix Ad
Prosequendum; IRENE KNOSTER, individually; SYLVIA ANN REA;

Appellants,

v.

FORD MOTOR COMPANY,

Defendant/Third Party Plaintiff,

v.

IRENE KNOSTER,

Third Party Defendant.

_____

On Appeal from the United States District Court
for the District of New Jersey
(No. 01-cv-03168)
District Judge: Honorable Mary Little Cooper
Argued June 15, 2006

Before: FISHER, CHAGARES and REAVLEY,[*] Circuit Judges.

_____

_____

[*]The Honorable Thomas M. Reavley, United States Circuit Judge for the Fifth
Circuit, sitting by designation.

Thomas J. Murray (Argued)
Mary S. O'Neil
Murray & Murray
111 East Shoreline Dr.
P.O. Box 19
Sandusky, OH 44871

Counsel for Appellant

Susan L. Bucknum (Argued)
Campbell Campbell Edwards & Conroy P.C.
690 Lee Rd., Suite 300
Wayne, PA 19087

Counsel for Appellee

OPINION OF THE COURT

CHAGARES, Circuit Judge.

On the evening of July 3, 1999, a one-car crash in Hunterdon County, New Jersey claimed Edward Knoster's life. In this diversity case, appellants Irene Knoster, Sylvia Rea, and the Estate of Edward Knoster (collectively, "the Knosters") seek to recover damages from the car's manufacturer, Ford Motor Company. Specifically, they bring failure-to-warn and design-defect claims under the New Jersey Product Liability Act ("PLA"), N.J. Stat. Ann. §§ 2A:58C-1 to -11, and an additional claim under the New Jersey Consumer Fraud Act ("CFA"), N.J. Stat. Ann. § 56:8-1 to -106.

The District Court dismissed the consumer fraud claim at the close of evidence, and a jury rejected the failure-to-warn and design-defect claims. On appeal, the Knosters

challenge two of the District Court's evidentiary rulings, its jury instructions, and its dismissal of the consumer fraud claim. As we explain below, neither the District Court's evidentiary rulings nor its instructions on Ford's duty to warn contained reversible error. But its design-defect instruction did, and we disagree with its conclusion that the PLA subsumes the Knosters' consumer fraud claim. We will therefore affirm in part, reverse in part, and remand for further proceedings.

I.

As we write for the parties and the District Court, we will provide only a brief sketch of this case's facts. It was a Fourth-of-July weekend, and Irene Knoster was driving home from a family picnic in her 1993 Ford Taurus. Her daughter, Sylvia Rea, was in the front passenger seat, and her husband, Edward Knoster, sat in the rear on the driver's side. As the Taurus approached the crest of a steep, winding hill leading to a T-shaped intersection, Mrs. Knoster downshifted. At that moment, and for whatever reason, the Taurus accelerated toward the intersection at a furious pace. In a desperate struggle to control the vehicle, Mrs. Knoster slammed on the brake and jerked the wheel. Her efforts failed; the car sailed through the intersection and crashed into a stone farm building. Mrs. Knoster and her daughter survived, but Mr. Knoster's injuries were fatal.

The core of the parties' dispute was the cause of the Taurus's acceleration. The Knosters claimed that it took off suddenly without Mrs. Knoster ever having stepped on the gas pedal. Their theory was that the vehicle's electronic engine controls produced transient electrical signals capable of activating the cruise control and opening the throttle

3

without any driver input. This failure would then pull the gas pedal to the floor and send the car careening forward. After it was over, the failure would leave no detectable evidence behind. In support of this theory, the Knosters produced documents from several Ford studies, the testimony of Mrs. Knoster and Ms. Rea, and the expert testimony of Samuel Sero, an electrical engineer.

Ford argued that the Knosters' story is physically impossible. It claimed that if the Taurus accelerated, it must have done so because Mrs. Knoster reached for the brake but accidentally stepped on the gas. Def. Br. at 5. In support of this argument, Ford sought to introduce two reports produced by the National Highway Traffic Safety Administration ("NHTSA"). The NHTSA launched a comprehensive investigation into reported incidents of sudden acceleration in October, 1987, and after two years of work it issued a report detailing its findings ("the NHTSA Report"). The NHTSA Report concluded that "two or more independent, intermittent failures would have to occur simultaneously to cause throttle opening in a way that would be difficult to detect after the incident." Joint Appendix ("JA") 3695. According to the NHTSA, this confluence of events is "virtually impossible." JA 3695. Ten years later, attorney Sandy McMath petitioned the NHTSA to reopen the matter. JA 4124-29. The NHTSA's Office of Defects Investigation conducted a review, and in April, 2000, it issued a document denying the petition ("the McMath Denial"). JA 4130-64. Another important part of Ford's defense was the testimony of retired Ford employee William Koeppel. He attempted to rebut the Knosters' assertion that a rise in sudden-acceleration reports coincided with Ford's

4

introduction of electronic engine controls.

Upon considering the evidence and charge, the jury rendered a verdict for Ford. This appeal followed, and the Knosters present six questions for our review. First, were the NHTSA Report and McMath Denial (collectively, "the reports") either irrelevant or hearsay not within the exception for public records? Second, did Mr. Koeppel's testimony include inadmissible lay opinion? Third, in response to the jury's query, did the District Court improperly limit the scope of Ford's duty to warn? Fourth, should the court have instructed the jury on section 3 of the <u>Restatement (Third) of Torts: Products Liability</u>? Fifth, should it have instructed the jury on New Jersey's consumer-expectations test for design defectiveness? And sixth, was it error to dismiss the Knosters' consumer fraud claim? We will address each question in turn.

## II.

The Knosters claim that the NHTSA Report and the McMath Denial are irrelevant and constitute inadmissible hearsay. Under Federal Rule of Evidence 401, relevant evidence "make[s] the existence of any fact that is of consequence. . . more probable or less probable than it would be without the evidence." This standard "is not high, and once the threshold of logical relevancy is satisfied the matter is largely within the discretion of the trial court." <u>United States v. Steele</u>, 685 F.2d 793, 808 (3d Cir. 1982) (internal citation omitted). The Knosters claim their automobile suddenly and spontaneously accelerated, and the reports concluded that such an event is "virtually impossible." JA 3695, 4162. Thus, if believed, the reports tend to make "a fact that is of

5

consequence. . . less probable," and they satisfy the dictates of Rule 401.

Even though the reports are relevant, they are also hearsay and thus are not admissible unless they fit within an exception to the hearsay rule. See Fed. R. Evid. 801-02. Rule 803(8)(C) provides an exception for public reports "setting forth. . . factual findings resulting from an investigation made pursuant to authority granted by law, unless the sources of information or other circumstances indicate lack of trustworthiness." Public reports are presumed trustworthy "and the party opposing their introduction bears the burden of coming forward with enough negative factors to persuade a court that a report should not be admitted." See In re Nautilus Motor Tanker Co., 85 F.3d 105, 113 (3d Cir. 1996) (quotation omitted). The Advisory Committee notes to Rule 803(8) provide a helpful list of factors for courts to consider: (1) the investigation's timeliness; (2) the expertise or experience of the official; (3) whether a hearing was held and, if so, how the hearing was conducted; and (4) "possible motivation problems."

The District Court held that the reports are sufficiently trustworthy, and we review that determination for abuse of discretion.[1] "An abuse of discretion is a clear error of judgment, and not simply a different result which can arguably be obtained when

---

[1]The Knosters argue that a *de novo* standard should be applied, but our precedents are to the contrary. See Coleman v. Home Depot, Inc., 306 F.3d 1333, 1341 (3d Cir. 2002) ("We review the admissibility of evidence for abuse of discretion. . . . This standard applies to Rule 803(8)(C). . . ."); United States v. Versaint, 849 F.2d 827, 831-32 (3d Cir. 1988) ("Under [Rule 803(8)], this Court must decide whether the district court abused its discretion by giving undue weight to trustworthiness factors of slight relevance while disregarding factors more significant.") (internal quotation omitted).

6

applying the law to the facts of the case." SEC v. Infinity Group Co., 212 F.3d 180, 195 (3d Cir. 2000) (internal quotation omitted).

The Knosters contend that the reports are untrustworthy for three reasons. First, they dispute the reliability of the NHTSA's methods. They argue that the NHTSA Report's claim of extensive testing on 10 representative vehicles was inaccurate. They note that only the Audi received electronic testing, and even that was preliminary. See Pl. Br. at 24; Reply Br. at 1. The Knosters also claim that the McMath Denial was the work of a single NHTSA employee who did no more than test drive vehicles and talk to people. Pl. Br. at 19. These characterizations, however, unfairly diminish the extent of the NHTSA's undertaking. In preparing the NHTSA Report, the NHTSA studied reports of sudden acceleration; interviewed drivers; examined "fuel systems, braking systems, and driving controls;" and performed tests and experiments. JA 3693-94. It also supplemented its own considerable expertise with an independent panel of mechanical and electrical engineers, MIT professors, and even Ray Magliozzi of National Public Radio's "Car Talk." See JA 3750-67. As to the McMath Denial, the Office of Defects Investigation performed a wide array of research; "[i]nspected various Ford vehicles to understand cruise control operation;" studied vehicle specifications; and disassembled one of Ford's "Mechanical Vacuum Dump Valves. . . to learn more about its operation." JA 4134-36. The NHTSA's methods do not diminish the reports' presumption of reliability; they reinforce it. See Nautilus, 85 F.3d at 113. Even if the NHTSA's electromagnetic testing could have swept more broadly, it was hardly a "clear error of

7

judgment" to let the jury assess the reports' probative value.  See Infinity Group, 212 F.3d at 195; see generally Jarvis v. Ford Motor Co., 283 F.3d 33, 53 (2d Cir. 2002) (in matter where sudden acceleration alleged "[t]he weight given to the conclusions in the NHTSA report. . . was a matter for the jury to decide.").

Second, the Knosters contend that their "main objection to the admission of the McMath Denial [is] the enormous prejudice engendered by its *ad hominem* attacks on the Knosters' expert, Samuel Sero."  Reply Br. at 3.  If the Knosters thought the McMath Denial was unfairly prejudicial, they should have raised an objection under Federal Rule of Evidence 403.  But even so, the McMath Denial does not contain *ad hominem* attacks. It states that Mr. Sero is "plainly wrong;" that his theory has been "addressed and rebutted;" that "no credible evidence" supports it; that he "takes up the position that drivers are not responsible for the safe operation of their vehicles;" and that his testing is "misleading" and "completely inconsistent with real world driver behavior."  JA 4144-45, 4155, 4158-59.  These are not arguments against the person; they are arguments against the person's testing and his methodology.  See Ruggero J. Aldisert, Logic For Lawyers: A Guide to Clear Legal Thinking 182 (3d ed. 1998).[2]  The McMath Denial focused upon Mr. Sero's testing and methodology and was not unfairly prejudicial.

Third, the Knosters claim that false and misleading disclosures by Ford rendered

_____

[2]We express no opinion on the admissibility of Mr. Sero's testimony. The District Court conducted a Daubert hearing, but it reserved ruling on the issue, and Mr. Sero testified at trial. See Def. Br. at 5.

8

the NHTSA reports untrustworthy. The District Court assumed *arguendo* that Ford

misled the NHTSA, but it held that the reports remained trustworthy because Ford's

alleged omissions "represent[ed] only a tiny fraction of the universe of information that

NHTSA. . . and the independent panel of experts considered." JA 32. We agree with that

analysis and thus hold that the District Court did not abuse its discretion when it admitted

the NHTSA Report and the McMath Denial.

III.

The Knosters also contend that William Koeppel's testimony included

inadmissible lay opinion. See Fed. R. Evid. 701. "We review the district court's ruling

that. . . opinions were admissible under Rule 701 for abuse of discretion." United States

v. Leo, 941 F.2d 181, 192-93 (3d Cir. 1991). However, when a party fails to object we

review for plain error. Abrams v. Lightolier, Inc., 50 F.3d 1204, 1213 (3d Cir. 1995).

Furthermore, if the objecting party elicited the testimony, she cannot be heard to

challenge its admission on appeal. See United States v. Console, 13 F.3d 641, 660 (3d

Cir. 1994).

Under Rule 701, lay opinion cannot be "based on scientific, technical, or other

specialized knowledge within the scope of Rule 702." Fed. R. Evid. 701(c).[3] In other

---

[3]Ford cites Asplundh Mfg. Div. v. Benton Harbor Eng'g, 57 F.3d 1190, 1193 (3d Cir. 1995) and Sipes v. United States, 111 F.R.D. 59, 61 (S.D. Cal. 1986), for the proposition that Rule 701 permits lay opinion based on specialized knowledge. But Congress amended Rule 701 in 2000, and the new rule plainly supercedes these cases. Indeed, the amendment was in part a response to the concerns expressed by Judge Becker in Asplundh. See Fed. R. Evid. 701 Adv. Comm. Notes; Asplundh, 57 F.3d at 1200-01 &

9

words, lay testimony must "result[] from a process of reasoning familiar in everyday life," as opposed to a process "which can be mastered only by specialists in the field." Fed. R. Evid. 701 Adv. Comm. Notes (internal quotation omitted).

Before Mr. Koeppel took the stand, the Knosters expressed concern about the scope of his testimony. Specifically, they worried that he would draw an inference that the increase in sudden-acceleration reports resulted from an increase in media attention. Supplemental Appendix ("SA") 9-10. According to them, this inference does not follow from "a process of reasoning familiar in everyday life;" it requires specialized knowledge of psychology and statistics. See Fed R. Evid. 701 Adv. Comm. Notes. The District Court responded that Koeppel could testify about the correlation he observed, but he should "offer[] the jury the opportunity to infer their own conclusions." SA 11. The Knosters' attorney agreed with that analysis. SA 12 ("Sure, I have no problem with. . . . correlation. It's the causation that I have a problem with."). Nonetheless, during direct examination Koeppel drew a causal inference on two occasions. See JA 2595; 2599. He also referenced hearsay reports from the Canadian and Japanese governments. JA 2575-79.

The Knosters, however, did not contemporaneously object to any of this testimony. We therefore review its admission for plain error. See Abrams, 50 F.3d at 1213. Despite

---

n.14 (determining that "it is not for us to rewrite the rule" but nonetheless "commending th[e] issue to the attention of the Judicial Conference Advisory Committee on Rules of Evidence").

Koeppel's two stray references to his causal conclusions, the jury remained free to accept or reject them. Moreover, his opinions were largely duplicative of a similar discussion in the NHTSA Report. See NHTSA Report, JA 3745 ("[W]hen the media focus on the matter and suggest there are unknown mechanical or electronic causes,. . . some incident-involved drivers may. . . conclude that their vehicles must be at fault."). Thus, even if the testimony was improper, it did not "undermine the fundamental fairness of the trial" or "contribute to a miscarriage of justice." See Osei-Afriyie v. Medical College of Pa., 937 F.2d 876, 881-82 (3d Cir. 1991).

All of Koeppel's other allegedly improper statements were made during cross examination. As to this testimony, "if there was any error at all, it was invited error and cannot now be a basis for reversal." See Console, 13 F.3d at 660. We therefore conclude that the admission of Koeppel's lay opinion was not reversible error.

IV.

The next issue concerns the jury's request for supplemental instruction.[4] When a jury asks a question during deliberations, "the court has a duty to respond. . . and the form

---

[4]In a diversity case such as the case *sub judice*, we apply the substantive law of the state whose law governs and federal procedural law. The parties do not dispute that the substantive law of New Jersey applies herein. Further, when "adjudicating a case under state law, we are not free to impose our own view of what state law should be; rather, we are to apply existing state law as interpreted by the state's highest court in an effort to decide how that court would decide the precise legal issues before us." Koppers Co., Inc. v. Aetna Cas. & Sur. Co., 98 F.3d 1440, 1445 (3d Cir. 1996).

11

and extent of supplemental instructions are within the sound discretion of the court."

Beardshall v. Minuteman Press Int'l, Inc., 664 F.2d 23, 28 (3d Cir. 1981).  Nonetheless,

we exercise plenary review over claims of legal error and "must determine whether the

charge taken as a whole fairly and adequately submits the issues in the case to the jury."

See Limbach Co. v. Sheet Metal Workers Int'l Ass'n, 949 F.2d 1241, 1259 n.15 (3d Cir.

1991) (en banc) (internal quotations omitted).

The jury's request involved Question 3 on the verdict sheet—the Knosters' failure-

to-warn claim.  The jury asked whether it should "answer the question regarding a

warning specifically about the design of the cruise control system or in general about an

event of sudden acceleration no matter what the cause."  JA 3291.  Over the Knosters'

objection, the court responded: "Your answer to question number 3 should be based only

on the design of the cruise control system. . . ."  JA 3291.  On appeal, the Knosters argue

that Ford had a duty to warn about a danger of sudden acceleration no matter what the

cause.

In the abstract, the Knosters' argument in this regard has some merit.  A failure-to-

warn claim is not dependent upon proof of a separate design defect.  The defect in a

failure-to-warn case "is not a flaw in the structure or design of the product," but "the

absence of a warning to unsuspecting users that the product can potentially cause injury."

Coffman v. Keene Corp., 133 N.J. 581, 593-94 (1993).  Thus, Ford's duty to warn

involved the danger of sudden acceleration generally, not a danger with any specific

cause.

12

Nonetheless, a "strict liability charge to a jury should be tailored to the factual situation." Campos v. Firestone Tire & Rubber Co., 98 N.J. 198, 210 (1984); see also Limbach, 949 F.2d at 1259 n.15 (stating that a charge must, "in light of the evidence, fairly and adequately submit[] the issues in the case to the jury."). In this case, the only cause of sudden acceleration asserted was an activation of the cruise control by transient electrical signals. If this failure was not possible, there was no danger of sudden acceleration to warn about. Indeed, the Knosters' proposed warning stated that disconnecting the cruise control would abate the danger completely. JA 3163. Thus, under their own theory, a cruise-control failure was a necessary predicate to the failure-to-warn claim. Cf. JA 2922 (plaintiff's counsel stating that "it's my understanding that failure to warn is subsumed within the defective design case."). The District Court's answer properly instructed the jury that it should not speculate about causes of sudden acceleration wholly unsupported by the record. It therefore "fairly and adequately submitted the issues in the case to the jury," and we will affirm the District Court's judgment as to the failure-to-warn claim. See Limbach, 949 F.2d at 1259 n.15.

V.

We next consider whether the District Court erred by failing to instruct the jury under section 3 of the Restatement (Third) of Torts: Products Liability. Under New Jersey law, a design-defect claim usually requires "proof by plaintiff of a reasonable alternative design the omission of which renders the product not reasonably safe." See

13

Cavanaugh v. Skil Corp., 164 N.J. 1, 8 (2000) (internal quotation omitted).[5] The District

Court used this standard here, but the Knosters contend that this was error. According to

them, the appropriate test of design defectiveness in this case is that provided by section 3

of the Restatement—the products-liability analogue of *res ipsa loquitur*. It provides:

> It may be inferred that the harm sustained by the plaintiff was caused by a
> product defect existing at the time of sale or distribution, without proof of a
> specific defect, when the incident that harmed the plaintiff:
> (a) was of a kind that ordinarily occurs as a result of a product defect; and
> (b) was not, in the particular case, solely the result of causes other than
> product defect existing at the time of sale or distribution.

Restatement (Third) of Torts: Products Liability § 3 (1997).

New Jersey has long applied a version of *res ipsa* in products cases, see

Jakubowski v. Minn. Mining & Manufacturing, 42 N.J. 177, 184 (1964), and in 1999 the

New Jersey Supreme Court explicitly adopted section 3. See Myrlak v. Port Authority,

157 N.J. 84, 103-04 (1999). Myrlack, however, was a manufacturing case, and Ford

argues that its holding does not extend to design defects. Def. Br. at 52-54. We disagree.

The New Jersey Supreme Court has recognized the availability of circumstantial proof to

show "that the product is defective because of a manufacturing flaw *or design defect*."

See Scanlon v. General Motors Corp., 65 N.J. 582, 592 (1974) (internal quotation

omitted) (emphasis added); see also Suter v. San Angelo Foundry & Machine Co., 81 N.J.

---

[5]Somewhat confusingly, the PLA makes the absence of "a practical and technically feasible alternative design" a *defense*. N.J. Stat. Ann. § 2A:58C-3(a)(1). Nonetheless, "the statute does not alter the plaintiff's burden to show defendant's failure to follow a reasonable alternative design." Cavanaugh, 164 N.J. at 7.

150, 170-71 (1979).  Moreover, <u>Myrlak</u> adopted section 3 without qualification, and that provision is not limited to manufacturing cases.  <u>See</u> 157 N.J. at 103-04; <u>Restatement (Third)</u> § 3.[6]  The <u>Restatement</u>'s comments point out that when a "product design causes the product to malfunction in a manner identical to that which would be ordinarily be caused by a manufacturing defect," section 3 may apply.  <u>See</u> <u>Restatement (Third)</u> § 3, comment b.

The first element of section 3 recognizes that sometimes a product fails so utterly that "common experience" indicates it would not have done so absent a defect.  <u>See</u> <u>Myrlak</u>, 157 N.J. at 105; <u>cf.</u> <u>Mettinger v. W.W. Lowensten, Inc.</u>, 292 N.J.Super. 293, 309 (App. Div. 1996).  The comments accompanying section 3 provide the example of an airplane that loses its wings.  <u>See</u> <u>Restatement (Third)</u> § 3, comment b.  Similarly, in a case that predates <u>Myrlak</u>, the New Jersey Supreme Court stated that a bicycle without functioning brakes is "self-evident[ly]" defective.  <u>See</u> <u>Suter</u>, 81 N.J. at 170-71.  Here, the Knosters introduced evidence that the Taurus suddenly accelerated without any driver input.  If the jury believed that evidence, then the Taurus was as dangerous and as useless as a plane without wings or a bike without functioning brakes.  "Common experience" teaches that so manifest a product failure would not ordinarily occur in the absence of some defect.  <u>See</u> <u>Myrlak</u>, 157 N.J. at 105.

---

[6]As the <u>Restatement</u>'s co-Reporter has explained, "Tentative Draft No. 1 limited the application of the *res ipsa* doctrine to manufacturing defect cases."  But after an "intense deliberative process," that limitation was dropped.  <u>See</u> Aaron D. Twerski, <u>Inside the Restatement</u>, 24 Pepp. L. Rev. 839, 842-44 (1997).

15

Section 3's second element demands that the plaintiff exclude other possible causes of the incident. See Scanlon, 65 N.J. at 593. "Generally speaking, the older a product is, the more difficult it is to prove that a defect existed while in the control of the manufacturer." Id. But in some cases the evidence can sufficiently exclude other possible causes "without reference to the product's age." Id. at 593 n.4. Plaintiffs need not exclude other causes beyond all doubt; the question is whether their evidence, if believed, "permit[s] an inference" of defectiveness. See Sabloff v. Yamaha Motor Co., 59 N.J. 365, 366 (1971) (per curiam); cf. Jerista v. Murray, 185 N.J. 175, 192 (2005) (the applicability of *res ipsa* "depends on the balance of probabilities"); Terrell v. Lincoln Motel, Inc., 183 N.J.Super. 55, 61 (App. Div. 1982) (stating that a "*res ipsa* instruction [can] be expressly conditioned upon plaintiff's ability to prove his version of the incident by a fair preponderance of the credible evidence.").[7] Mrs. Knoster and Ms. Rea testified that the Taurus suddenly and spontaneously accelerated without driver input. And despite the Taurus's age, Mr. Sero testified that it did so as a result of its design.[8] If believed, this

---

[7]See also Restatement (Third) § 3, illustration 6 ("[Plaintiff's] qualified expert presents credible testimony that a defect in the automobile must have caused the accident. [Defendant's] qualified expert presents credible testimony that it is equally likely that, independent of any defect, Driver lost control while speeding on the highway. If the trier of fact believes the testimony of Driver's expert, then an inference of defect may be established under this Section.").

[8]Ford cites Scanlon, 65 N.J. at 598, for the proposition that the Knosters' attempt to prove a specific defect precludes the application of section 3. But Scanlon held only that a plaintiff "cannot. . . be heard to argue for reversal on a question foreign to the initial proceedings." Id. Generally speaking, "the plaintiff is not necessarily confined to the explanation his expert may advance." Sabloff, 59 NJ at 366; Scanlon, 65 N.J. at 598

16

evidence would support a determination by the trier of fact that the Knosters excluded other possible causes. See Restatement (Third) § 3, illustration 6. We therefore hold that the Knosters' evidence may permit an inference of defectiveness under section 3, and proof of a reasonable alternative design was unnecessary.

Instead of instructing under section 3, the District Court stated that even if the jury believed the Knosters' proofs—even if the Taurus suddenly accelerated without Mrs. Knoster stepping on the gas—it still had to determine "whether the safety benefits from alternate design of the vehicle, as proposed by plaintiffs, were greater than resulting costs or disadvantages caused by the plaintiff's proposed design." JA 3158. But when, as here, a product's failure is manifest, proof of reasonable alternative design is unnecessary. See Restatement (Third) § 3, comment b; cf. New Jersey Model Civil Charges 5.34C-1 (stating that for design defects "akin to manufacturing defect[s]. . . . the usual Risk-Utility Balancing Test is unnecessary"). By focusing the jury's attention on that issue, the District Court did not "fairly and adequately" apprise the jury of the issues properly before it. See Limbach, 949 F.2d at 1259 n.15. We will therefore reverse the District Court's judgment as to the design-defect claim and remand for further proceedings.

VI.

The Knosters also claim that the "consumer-expectations" test applies. In Suter v.

---

(stating that, "as a general proposition," Sabloff allows for "flexibility. . . both in terms of proof and theory of the case"). Here, the Knosters sought a section 3 instruction before the District Court. As a result, Sabloff's "flexibility" is available to them.

San Angelo Foundry & Machine Company, 81 N.J. 150 (1979), the New Jersey Supreme Court stated that when a product defect is "self evident"—i.e., when the "nature of the proofs [is] the same as in [manufacturing] defect cases"—then the jury can infer a defect if the product failed to meet "the reasonable expectations of the purchaser." Id. at 170-71. Although Suter predates Myrlak by 20 years, the Suter test is no more than an alternative formulation of the principle embodied in section 3. See Restatement (Third) § 3, Reporters' Note ("Some courts in applying the § 3 principle talk in terms of the product failing to meet 'consumer expectations.'"). To say that a defect is "self evident" is to say that it speaks for itself—*res ipsa loquitur*. As such, we need not engage in separate analysis of Suter's consumer-expectations test.

## VII.

Finally, the Knosters argue that the PLA does not subsume their consumer fraud claim and, therefore, the District Court erred in dismissing this claim. The CFA prohibits "any unconscionable commercial practice, deception, fraud, false pretense, false promise, misrepresentation, or the knowing concealment, suppression or omission of any material fact with intent that others rely. . . in connection with the sale or advertisement of any merchandise. . . ." N.J. Stat. Ann. § 56:8-2. Private parties must prove that they suffered an "ascertainable loss of moneys or property" as a result of the unlawful practice. Id. § 56:8-19. If successful, they can recover treble damages and reasonable attorneys' fees. Id. However, only economic damages are recoverable. See Gennari v. Weichert Co.

18

Realtors, 148 N.J. 582, 612-13 (1997).

Section 2 of the PLA, N.J. Stat. Ann. § 2A:58C-2, "establishe[s] the sole method to prosecute a 'product liability action.'" Tirrell v. Navistar Int'l, Inc., 248 N.J.Super. 390, 398 (App. Div. 1991). The PLA defines the term "product liability action" as "any claim or action. . . for harm caused by a product, irrespective of the theory underlying the claim, except actions for harm caused by breach of an express warranty." N.J. Stat. Ann. § 2A:58C-1(b)(3). Thus, the PLA "effectively creates an exclusive statutory cause of action for claims falling within its purview." See Repola v. Morbank Indus., Inc., 934 F.2d 483, 492 (3d Cir. 1991); Tirrell, 248 N.J.Super. at 398. Nonetheless, claims for "physical damage. . . to the product itself" are not "product liability action[s]" because the PLA specifically excludes such damage from its definition of "harm." N.J. Stat. Ann. § 58C-1(b)(2), (3); see Alloway v. General Marine Ins. L.P., 149 N.J. 620 (1997).

The District Court pointed out the dearth of authority in New Jersey on how the CFA and the PLA relate to one another. JA 2941. In this case, however, there is no overlap between them. In their CFA claim, the Knosters seek only economic damages resulting from harm to the Taurus itself. Pl. Br. at 56; Reply Br. at 20-21. The PLA excludes those damages from its definition of "harm," so the Knosters' CFA claim was not a "product liability action." See N.J. Stat. Ann. § 58C-1(b)(2), (3). That critical fact readily distinguishes the two District Court decisions cited by Ford. In Walus v. Pfizer, Inc., 812 F.Supp. 41 (D.N.J. 1993), the plaintiff sued Pfizer based on his worry that a normally functioning heart valve might fail at some future time. Id. at 42-43. The

19

plaintiff sought to recover for *his* emotional distress, not harm to the product itself. Id. at 44. In <u>Brown v. Philip Morris, Inc.</u>, 228 F.Supp.2d 506 (D.N.J. 2002), the fraud claim involved physical injuries caused *by* cigarettes, not harm *to* cigarettes. Id. at 517. Unlike those claims, the Knosters seek only to recover for harm to the Taurus, and the PLA does not cover those damages. The PLA cannot *subsume* that which it explicitly *excludes* from its coverage. We will therefore reverse the District Court's judgment as to the CFA claim.

It is far from clear, however, whether the Knosters have a cognizable claim under the CFA. In order to sustain a CFA claim, the plaintiff must establish "a causal relationship. . . between any ascertainable loss and the unlawful practice condemned." <u>Ramanadham v. New Jersey Mfrs. Ins. Co.</u>, 188 N.J. Super. 30, 33 (App. Div. 1982). Ford did not raise the causation issue in the District Court, nor has it done so in this appeal. We will therefore refrain from addressing the causation requirement and allow the District Court to consider the issue in the first instance.

VIII.

Based on the foregoing, we will affirm the District Court's judgment as to the failure-to-warn claim and its evidentiary rulings at trial, reverse it as to the design-defect and consumer fraud claims, and remand the case for further proceedings.

REAVLEY, <u>Circuit Judge</u>, dissenting:

I would affirm the judgment. The case was tried on the claim that a design defect

of the cruise control caused the accident.  That issue was decided against the plaintiffs.  It was the speed of the cruise control setting that resulted in the wreck, but the control was not defective.  Six years after Ford lost custody of this vehicle I see no justification for a res ipsa issue.  And I see no evidence of consumer fraud by Ford.