722 A.2d 587

H.T. ROSE ENTERPRISES, INC. T/A ROY ROGERS RESTAURANT, PLAINTIFF–APPELLANT, v. HENNY PENNY CORPORATION, DEFENDANT–RESPONDENT, AND ATLANTIC FIRE SERVICES, INC., AND KIDDE, INC., DEFENDANTS.

Superior Court of New Jersey
Appellate Division

Argued January 13, 1999—Decided February 1, 1999.

478

Before Judges BAIME, CONLEY and KIMMELMAN.

*Allan Maitlin,* argued the cause for appellant (*Sachs, Maitlin, Fleming, Greene, Wilson & Marotte,* attorneys; *Philip B. Harrison,* on the brief).

*M. Karen Thompson,* argued the cause for respondent Henny Penny Corp. (*Norris, McLaughlin & Marcus,* attorneys; *Ms. Thompson,* of counsel; *Ms. Thompson* and *Steven A. Karg,* on the brief).

The opinion of the court was delivered by

CONLEY, J.A.D.

Plaintiff's Bordentown Roy Rogers restaurant sustained substantial damage from a fire in November 1993 that originated in one of the restaurant's deep-fat chicken fryers. The fryer was manufactured by defendant Henny Penny in 1976. Along with the entire restaurant, the fryer was purchased by plaintiff from Gino's in 1985. No evidence exists as to its use and maintenance from 1976 to 1985 while the restaurant was owned by Gino's. Similarly, no evidence exists as to its use and maintenance while under plaintiff's ownership, except for the two-year period before the fire, and that evidence is skimpy, at best. At the time of the summary judgment in favor of Henny Penny and the denial of plaintiff's motion for reconsideration, from which plaintiff appeals, plaintiff's products liability theory as to Henny Penny was premised upon an alleged manufacturing flaw in the fryer's high-limit thermostat. It was plaintiff's expert's position that had the thermostat been operating properly, it would have shut down the fryer prior to the fire's outbreak.

Summary judgment was granted Henny Penny because of the deficiencies in plaintiff's evidence as to whether Henny Penny had manufactured the fryer with the same high-limit thermostat that was on the fryer in 1993 at the time of the fire.[1] The motion judge also thought plaintiff's expert's manufacturing defect opinion constituted a net opinion, a determination we need not reach. We are convinced summary judgment was properly granted because, even viewing the evidence most favorably for plaintiff, no reasonable juror could conclude that the preponderance of the evidence establishes that the high-limit thermostat in the fryer in 1976 when Henny Penny placed it into the stream of commerce was the same high-limit thermostat in the fryer in 1993. We are

---

[1] Plaintiff also sued the installer of a chemical fire extinguisher system, Atlantic Fire Services, Inc., and the manufacturer of the system, Kidde, Inc. The claims against Kidde were voluntarily dismissed without prejudice. The claims against Atlantic Fire Services were settled just prior to trial.

convinced the scant evidence on this issue presents precisely the type of case that, perhaps, may have survived a motion for summary judgment prior to *Brill v. Guardian Life Ins. Co. of Am.*, 142 *N.J.* 520, 666 *A.*2d 146 (1995), but no longer can.

The record before the motion judge revealed the following. According to the statements obtained from plaintiff's employees, on November 10, 1993, at 7:25 a.m., one of plaintiff's employees, Michelle Brown, saw flames rising from a fryer located in plaintiff's Bordentown Roy Rogers restaurant. The restaurant's manager, Mickie Greene, had turned on the fryer at 6:30 a.m. that morning. By the time Brown discovered the fire, the flames had reached the bottom of the overhead exhaust hood. Brown alerted Greene, who initially extinguished the flames with a portable fire extinguisher. Greene immediately called the fire department. However, within seconds, the fire reignited. This time Greene was unable to extinguish the flames and was unable to reach the manual lever to activate the dry powder fire extinguishing system. Greene and Brown then left the building. At that point, the automatic extinguishing system had not activated and, ultimately, the entire store with all of its equipment was substantially damaged.

The fryer in which the fire originated was located in the middle of a bank of three fryer units. All three units were gas-fired, deep-fat pressure fryers, consisting of an eighteen-inch wide stainless steel cabinet containing a built-in cook pot, a gas burner, and a tub for collecting drained fat. The fryers' cook pot had a sloping bottom which was shallow in the front and eighteen inches deep in the rear. The gas burner was centered beneath the cook pot, towards its shallow end. A drain pipe and pump drained fat from the cook pot into the tub located beneath it through a filter screen, and pumped the filtered fat back into the cook pot. Periodically, all of the fat was drained and replaced by a solid block of fresh fat.

The fryers were equipped with two thermostats, an operating thermostat that regulated the temperature of the fat, and a high-limit thermostat that was designed to automatically shut off the

unit in the event the fat temperature exceeded the maximum possible temperature of the operating thermostat. The shut down was designed to occur before the overheating fat could auto-ignite and start a fire. The thermostats protruded into the cook pot from an area behind the control panel. Their sensor bulbs did not extend down the entire depth of the cook pot; it is unclear exactly how far down they did extend.

Plaintiff hired Paul Zamrowski Associates, Inc. to examine the fryer and the "engineering aspects" of the fire. It seems there was also another expert, Patrick J. McGinley Associates, as to the fire's cause and origin, but that report does not appear in the record provided to us. It was, however, one of the number of sources of information considered by plaintiff's expert, Frederic M. Blum.

Blum, a mechanical engineer, provided plaintiff with an initial report dated January 4, 1994. In that report, he concluded that the "fire clearly originated because of a malfunction of the operating thermostat in the fryer plus a malfunction of the high-limit thermostat which failed to shut off the fryer after the operating thermostat failed." However, the actual condition of either of the thermostats "could not be determined due to fire damage." Moreover, as to the operating thermostat, it seems that Blum has never contended it failed because of a manufacturing or design defect, but simply because it wore out, a normally expected event.

In his report, Blum explained that the night before the fire, the middle fryer had been drained of fat entirely, with a block of fresh fat placed in the cook pot. It is undisputed that this particular cook pot had been out of use for several weeks to a month prior to the day of the fire. None of plaintiff's witnesses professed to recall why, or whether, if the problem was some malfunction, it had been fixed. One of the employees did recall that it was "broken."

After the fire, Blum found "a small quantity of black, gooey, burned fat" that remained in the middle fryer. The fat tub also contained "a small quantity of black, gooey, burned fat." He

found evidence of fire damage in the tub area to be minimal and thought that "only a limited fire occurred in the tub which involved only a small quantity of fat." On the other hand, Blum found unburned fat on the top surface of the middle fryer and in the pots of the adjoining fryers, indicating that "fat boiled over from the middle fryer's cook pot." Also, the floor in the vicinity of the fryers was "covered with a quarter-inch thick layer of white, solidified, unburned fat."

Somewhat complicating the picture, Blum discovered the cook pot drain valve in the "OPEN" position after the fire, indicating that plaintiff's employees had not properly closed the valve the night before after cleaning and preparing it for use the next day. Leaving the valve open could mean that as the fat melted during the heating process the next day, it would empty from the cook pot into the drain tub, with the cook pot continuing to heat. Moreover, the fat tub was "shifted forward" from its normal position so that its rear wall was almost directly below the fat drain pipe outlet. Blum observed that "[i]n this position, fat running out of the outlet pipe would fall partially into the tub and mostly onto the floor," thus the fat found on the floor. Blum also found the sensor bulb on the high-limit thermostat to have been broken off, but he could not tell when this had occurred.

Blum acknowledged in his report that it was possible for a fire to occur in a fryer if it is not full of fat when it is turned on "because the temperature sensors of the thermostats must be submerged in order for them to heat." He also acknowledged that the fryer had been left in an improper condition by plaintiff's employees the night before the fire. But he was positive that this did not contribute to the fire. This was because it was his factual assertion, from which he never diverted, that at the time the fire started, the cook pot was still full of fat, despite the open valve. He was convinced the drain pipe was clogged by the fresh block of solid fat placed in the cook pot the night before and had not yet completely melted before the fire began.

Based on his determination that the fryer remained filled with fat during the fire and the thermostats consequently remained submerged in the fat, Blum concluded that both the operating and high-limit thermostats "failed." As to the operating thermostat, though, he said "[a]n operating thermostat is not expected to last forever" and this thermostat "undoubtedly just wore out." But because, he thought, the high-limit thermostat should activate rarely, if ever, it should never wear out and, thus, he concluded the high-limit thermostat on the fryer in November 1993 must have been defective because had it been operable, it would have shut the burner down. Although having no knowledge as to how many times during the seventeen or eighteen year existence of the fryer its high-limit thermostat triggered a shut down, Blum thought that "a component that operates so seldom should never fail." So, in its interrogatory answers, dated June 7, 1995, plaintiff informed defendant of its theory of products liability against Henny Penny thusly:

The high temperature thermostats of the Henny Penny fryer failed to operate shutting the fryer off. The temperature increased thereby causing the fire in question. See Zamrowski report for further detail.

Blum was deposed on May 6, 1996. He adamantly maintained his position that the cook pot was full of fat at the time the fire started. That was fundamental to his opinion of defect, as that opinion was premised upon his conclusion that the high-limit thermostat had failed. But he also considered another possibility as to why the thermostat did not work, that is, "it wasn't exposed to heat in the first place because the fat level was not high enough." In that event, he opined, for the first time, that the fryer suffered from a design defect in that it did not have a high-limit thermostat for low level fat. He said:

By the way, [this] possibility I did not list in my report, but I'm introducing it now [and it] represents [a] design defect in the fryer. *The reason is that the high limit thermostat must be designed for all unforeseeable conditions,* because the hazard is so immense from five pounds, or how much fat is in a fryer, the hazard is so immense, if that fat were to ignite, that *all reasonable means must be taken to make sure that the high limit function is absolute and cannot readily be violated during ordinary use of the fryer or in foreseeable misuse of the fryer.* . . .
. . . .

> ... *if it's possible that this high limit function can be compromised because the fat level is not high enough, then your design is wrong,* the design of the fryer is wrong, *because that high limit function must be able to shut that unit off under all foreseeable circumstances, one of which is there is insufficient fat in the unit.*
>
> Insufficient fat can occur because whoever fills the fryer doesn't put enough fat in it, or fat can be used up. Fat is used up in the frying process. It clings to the food, and our arteries suffer from it.
>
> You do periodically have to add more fat. If the fat level goes too low, even though the manufacturer does not intend it to go too low, it's certainly a foreseeable circumstance.
>
> The high limit function must operate even in that circumstance. *Even if it takes more than one sensor or more than one* physical thermostat, it doesn't matter. You cannot allow the possibility to occur, if you have anything to do with it, as a designer[,] of the fat igniting. It's just too tremendous a hazard.
>
> [Emphasis added.]

Blum did not, however, know where the high-limit thermostat's sensor bulb actually was located in the cook pot. He also continued to adamantly maintain that the factual premise necessitating the design defect theory was virtually impossible, given the physical evidence. As he put it "considering the possibility that there was only minimal fat in the cook pot, there was much too much fire in terms of its spread, in terms of its duration for that to have been the case." Blum reasserted his manufacturing defect theory and the factual premise it was based on in two subsequent supplemental reports but, in his supplemental report of November 27, 1996, again posited the design defect he mentioned during his deposition. However, he never asserted or explained that the design he proffered, *i.e.* two high-limit thermostats, one of which would extend to the bottom of the cook pot, was feasible.

Henny Penny's expert, Dennis Dyl, disagreed as to the factual origin of the fire. He thought that the improper condition of the fryer, left by the employees the night before, caused most of the fat to empty from the cook pot when it was turned on just before the fire started. This allowed the level of the fat to fall below the sensor bulbs of the thermostats such that the fat continued to heat up uncontrolled and ultimately reached the point of auto-ignition.

In addition, and critical to this appeal, Dyl issued a supplemental report on September 17, 1996, in which he stated: "due to the

age of the subject center fryer, fire damage and lack of maintenance records, it can not [sic] be determined if the operational thermostat and high limit control are the original controls installed by Henny Penny Corporation when the fryer was manufactured." He also observed that the manual high-limit controls on the two adjacent fryers had been replaced with automatic reset controls, "and thus it would be reasonable to assume that the high limit for the center fryer may have also been replaced."

On October 10, 1996, defendant filed its notice of motion for summary judgment, relying on Dyl's reports. Critical to the issue that forms the basis for our affirmance here, and in response to defendant's motion, Blum asserted in a subsequent report that he could not determine whether the high-limit thermostat was an original or similar replacement but, in his opinion, "strong evidence exist[ed] that it [was] probably original." He explained the "strong evidence" as such:

> *High limit thermostats are seldom called upon to actuate.* Daily operation of the fryer is governed by the operating thermostat which cycles on and off repeatedly to maintain fat temperature. By contrast, the high limit thermostat, which in terms of design is a very similar control, only actuates if the operating thermostat fails in the closed position so the burner stays operating longer than it should and the fat overheats. By design, when this occurs the high limit thermostat actuates and shuts off the burner indefinitely pending manual reset which entails opening the control panel. In other words, the high limit thermostat will actuate only once, only on those infrequent occasions when the operating thermostat fails in this particular manner. *Over the 18 years existence of the subject fryer, it is conceivable that the operating thermostat may have failed in this manner perhaps as often as once a year* (actually, less frequently is probably more likely), which means no more than about 18 times in the life of the subject fryer. *Is it reasonable to expect that a control of a similar design to one that functions thousands of times before failing will fail after functioning no more than about 18 times? Hardly. Clearly, it is overwhelmingly probable that the high limit thermostat installed in the subject fryer at the time of the fire is original.* ...

> The Motion for Summary Judgement asserts that H.T. Rose personnel were seen servicing the three Bordentown fryers on several occasions, but this assertion is not evidence the high limit thermostat of the subject fryer was ever replaced. In fact, *there is no evidence that anyone ever replaced the high limit thermostat on the subject fryer,* or even on other Henny Penny fryers at the H.T. Rose restaurants. We only know that some high limit thermostats of unknown type were replaced on some H.T. Rose fryers at unknown H.T. Rose restaurants.

In fact, other types of high limit thermostats exist which are not manual resetable, but rather automatically reset themselves when the fat has cooled below the thermostat's setpoint. With an automatic-reset thermostat, a fryer whose operating thermostat has failed can still be used, with the burner cycling on the high limit thermostat, albeit at a higher temperature which makes cooking more difficult. The situation may not be noticed for a considerable time. Therefore, in general an automatic-reset high limit thermostat will tend to function many more times than a manual-reset high limit thermostat. For this reason, *it may well be that other fryers owned by H.T. Rose required high limit thermostat replacement because they were of this different type, while the subject fryer did not.*
[Emphasis added.]

Blum's "strong evidence," thus, consisted of his assertion that a high-limit thermostat might be caused to trigger a shut down once a year and, thus, not wear out in the eighteenth or nineteenth year without some defect. He explained the replacement of the high-limit thermostats on the right and left fryers simply by speculating that perhaps the other fryers had needed replacement of their high-limit thermostat because their original manual-reset thermostats had been replaced by automatic-reset thermostats which required more frequent replacement. Of course, there exists no evidential basis for these speculations.

What the record reflects as to whether the subject high-limit thermostat was or was not the 1976 original is the following. According to plaintiff's interrogatories, during the time it had owned the restaurant prior to the fire (from 1985 to 1995), maintenance was performed by its employee, Ross Frankenfeld. Frankenfeld testified at deposition, however, that he maintained plaintiff's restaurants, including the Bordentown Roy Rogers, only from 1992 to 1994. In response to defendant's request in discovery for a list of all repairs and maintenance performed on the fryer from the date of installation through the date of the fire, plaintiff asserted that "[i]t would be burdensome to list all repairs and maintenance on this said fryer." This suggests that such records exist. But in response to defendant's motion for summary judgment, plaintiff supplied an attorney hearsay affidavit that any maintenance logs there may have been were destroyed in the fire and lost. We note, however, the deposition testimony on behalf of plaintiff of Philip Warden which

suggests no more than a lack of any effort to ascertain whether such records may have survived the fire.[2]

The deposition testimony of plaintiff's employees, moreover, would leave a reasonable person to very much question whether the high-limit thermostat on the fryer in 1993 was the same one on it in 1976. Margaret Postlethwait had been the general manager of the Bordentown restaurant for almost two years prior to the fire, leaving that position just one week earlier. During this period of time, she observed plaintiff's maintenance employees,

---

[2] In this respect, we note the following deposition testimony of Mr. Warden:

Q. And the log book for the Bordentown store, was there a log book used at that facility?

A. That was standard operating procedure. It should have been there.

Q. Do you know what happened to that log book after the fire?

A. No, I do not.

Q. Do you know where it was stored or kept at the Bordentown store before the fire?

A. Yes.

Q. And were any documents or other artifacts removed from the manager's office following the fire? (continued on next page)

A. Following the fire I think some personal possessions might have been removed from the manager's office. I think we tried to secure payroll records, probably, if they weren't damaged. But I don't think there was anything that wasn't damaged in that fire.

Q. Your double negative is confusing me. Are you saying everything was damaged the fire?

A. It looked to me like everything was damaged in the fire.

Q. When you say was damaged, do you mean water damage or smoke damage or fire damage?

A. All of the above.

Q. Did you make any particular—strike that. Who removed the payroll records from the manager's office after the fire?

A. I don't remember. I don't know.

Q. Did you give the direction for those records to be moved?

A. I would have given direction to secure any records that could be secured, which as the payroll records that are required by us by law, and I don't know if we actually secured any. A lot of the records were also stored not necessarily in the office but usually in the attic, and the attic sustained the heaviest damage or some of the heaviest damage.

Q. And you don't remember who you asked to go in and try to secure those records?

A. No, I don't. No. We had employees that we had to obviously get paid.

Ross Frankenfeld and Dan Christianson, working on the fryers in the Bordentown store at different times. Randy Tucker, who had worked at the Bordentown restaurant for five to six years prior to the fire, testified that he too had seen a person named Dan working on all three fryers over that period. He recalled the middle fryer being "broken" and out-of-service for about a month before the fire.

Frankenfeld, for his part, testified that he did not do any routine maintenance work on the fryers, only repair work when a problem was reported. He also acknowledged that he had replaced thermostats in fryers at plaintiff's various restaurants and that he typically stocked thermostats, including high-limit thermostats, in his truck. He acknowledged replacing an operating thermostat at the Bordentown restaurant in the right fryer. As for the high-limit thermostats, at first he said he "possibly" may have also replaced them, then admitted recalling that in fact he had, but he did not recall here. He denied having any knowledge that the center fryer had been out of service for the month before it was used on the day of the fire; but, when asked if he had ever repaired or maintained that fryer, his reply was "I'm not sure." Neither was he sure whether the center fryer's high-limit thermostat was missing its sensor bulb before the fire.[3]

The evidence that the high-limit thermostat that plaintiff's expert opined was defective was ever in the control of defendant, then, was weak, at best. And it was in the light of such weakness that defendant brought its motion for summary judgement. Interestingly, in opposing that motion, plaintiff did no more than to

---

[3] Defendant has provided us with Frankenfeld's entire deposition transcript. We have read it, as did the motion judge who was caused to comment "Frankenfeld? He—it's rather curious that he has good memory on some things and not a good memory on the other things. And I don't judge credibility ... But certainly I can't ignore the fact that somehow he remembers he performed service maintenance, repairs and replacements of the very thermostat that we're talking about here in some restaurants, but has no memory, or lapse of memory, when we talk about the restaurant in question." We quite agree with the motion judge's obvious discomfort with Mr. Frankenfeld's testimony.

rely upon its expert's assertion that it probably was the original thermostat. It did not, for instance, submit any information from the prior owner, Gino's, as to the repair or maintenance of the fryers. This prompted the motion judge to observe:

But we are talking about reasonable inferences from all the circumstances. And that's what we're looking for, is it reasonable under these circumstances?

See I asked about the restaurant for people who don't know about the place before and whether it is still around. Supposing—supposing that you had deposed the manager and they said, we've had this fryer here for ten years. Didn't touch it. Everything is together. Right?

[Counsel]: Do you mean of the original restaurant?

The Court: Yes. Genos.

[Counsel]: Yes.

The Court: And they said we purchased it in 1976. And when we sold it that was never serviced, never touched. The thermostat was never changed.

Now you have that information. And then your restaurant says, that thermostat was never changed, by deposition. The service records show that this deep fryer has been serviced, but that thermostat has never changed.

This is a circumstantial evidence, I think, that certainly would have allowed you to take this case to a jury and say this thermostat was never changed and consequently caused a fire. A defect must have existed at the time of manufacture. And that's the kind of circumstantial evidence, I think, from which you could make those fair inferences.

But, no, we don't have that here, obviously. All—what we have is a fire from which we are asked to conclude since it was a new thermostat, therefore, and it failed, it must have been defective. And it must not have been changed because it was new.

I'm thinking out loud right now. I'm really looking for those circumstances that really would make a reasonable jury to—to look at this issue. And I'm—I'm not seeing those circumstances.

## The judge ultimately decided:

My conclusion in this case is that the motion has to be granted because in accordance with SCANLON there's no evidence that this is the original thermostat that was on the machine when it was manufactured in 1976.

You have a ten-year gap wherein this machine was in the hands of other people who could have done any number of things. And, you know, in a sense it's like comparing it to criminal law and some analogies. You have a chain of custody. If you've established a chain of custody that this is and—and that it hasn't been contaminated, then the jury can reasonably conclude that it is which it purports to be.

But when you have this—a broken chain of custody as you do here because it was in the hands of somebody else. And all these possibilities of other people

doing work on the machine and changing it, repairing it. Then it's not necessarily reasonable and fair to ask the jury to infer that which your are seeking.

So I—I—I agree again with the defendant. There's no evidence that this is the original thermostat that the defendants put on the machine. And there's no evidence that it was defective when it left the manufacturer.

Our review of the entire record as presented to us convinces us that the motion judge did not err in this determination. Plaintiff's claim was one of a manufacturing defect in the high-limit thermostat. One of the elements of its burden of proof, then, was to demonstrate that the alleged manufacturing defect existed while the fryer was under the control of defendant, that is before it was sold in 1976. *E.g. Becker v. Baron Bros.*, 138 *N.J.* 145, 151, 649 *A.2d* 613 (1994); *O'Brien v. Muskin Corp.*, 94 *N.J.* 169, 179, 463 *A.2d* 298 (1983); *Michalko v. Cooke Color & Chem. Corp.*, 91 *N.J.* 386, 394, 451 *A.2d* 179 (1982). *See Scanlon v. General Motors Corp.*, 65 *N.J.* 582, 592–93, 326 *A.2d* 673 (1974). "It is not necessary to show that defendant created the defect. *What is important is that the defect did in fact exist when the product was distributed by and was under the control of defendant."* *Suter v. San Angelo Foundry & Mach. Co.*, 81 *N.J.* 150, 170, 406 *A.2d* 140 (1979) (emphasis added). The fact that the fire occurred, causing the damage to plaintiff, cannot support an "inference of defectiveness" against a defendant manufacturer; liability arises only if plaintiff proves that manufacturer's responsibility for that condition. *Zaza v. Marquess and Nell, Inc.*, 144 *N.J.* 34, 49, 675 *A.2d* 620 (1996). *See O'Brien v. Muskin Corp.*, *supra*, 94 *N.J.* at 179–80, 463 *A.2d* 298 ("[t]he necessity of proving a defect in the product [for which the manufacturer is responsible] as part of the plaintiff's *prima facie* case distinguishes strict from absolute liability, and thus prevents the manufacturer from also becoming the insurer of the product."). *See for example, Smith v. Keller Ladder Co.*, 275 *N.J.Super.* 280, 286, 645 *A.2d* 1269 (App. Div.1994); *Macri v. Ames McDonough Co.*, 211 *N.J.Super.* 636, 640–41, 512 *A.2d* 548 (App.Div.1986).

As to this element of a plaintiff's *prima facie* burden, existence of the alleged manufacturing defect while in the control

of defendant is particularly difficult where, as here, a product has been used for a substantial period of time. Direct evidence that the condition existed before the manufacturer placed the product into the stream of commerce will rarely be available. But the task is not impossible, as " 'evidence which would permit an inference that a dangerous condition existed prior to sale' " would suffice. *Scanlon v. General Motors Corp., supra*, 65 *N.J.* at 592–93, 326 *A.*2d 673 (quoting *Jakubowski v. Minnesota Mining and Mfg.*, 42 *N.J.* 177, 184, 199 *A.*2d 826 (1964)). Such an inference, of course, must be reasonable and, in the context of the plaintiff's burden of proof to establish a defect while in the control of the manufacturer by the preponderance of the evidence, must be more likely than not. As the court in *Scanlon* explained:

> Generally speaking, the older a product is, the more difficult it is to prove that a defect existed while in the control of the manufacturer. No product is intended to last indefinitely and many products require care and maintenance to perform at the same level as they did when new. With many products proof that the defect arose while in the hands of the manufacturer becomes very difficult, if not impossible, after a certain age; however, in certain situations mere age alone may not be sufficient to preclude an inference of a defect existing in the hands of the manufacturer. *The product itself must be of a type permitting the jury, after weighing all the evidence and particularly the other factors referred to [such as age, prior usage and durability], to infer that in the normal course of human experience an injury would not have occurred at this point in the product's life span had there not been a defect attributable to the manufacturer.*
>
> [*Id.* at 593, 326 *A.*2d 673 (emphasis added).]

Thus, the *Scanlon* circumstantial evidence test requires proof sufficient to support a conclusion that "in the normal course of human experience an injury would not have occurred at this point in the product's life span had there not been a defect attributable to the manufacturer." *Ibid. See Consalo v. General Motors*, 258 *N.J.Super.* 60, 64, 609 *A.*2d 75 (App.Div.), *certif. denied*, 130 *N.J.* 597, 617 *A.*2d 1220 (1992). *Compare Scanlon, supra*, 65 *N.J.* 582, 326 *A.*2d 673, with *Moraca v. Ford Motor Co.*, 66 *N.J.* 454, 332 *A.*2d 599 (1975). *And see Navarro v. George Koch & Sons, Inc.*, 211 *N.J.Super.* 558, 576–77, 512 *A.*2d 507 (App.Div.), *certif. denied*, 107 *N.J.* 48, 526 *A.*2d 138 (1986).

We suppose this is what plaintiff's expert was asserting when he claimed that the high-limit thermostat probably was the original because it should have been infrequently called upon to function. He did not, however, posit that, over the seventeen or eighteen years of the fryer's use, it had never operated to shut off the burner. It was his view that it might have done so once a year. But, as defendant points out, if a manufacturing defect was present at the time it left defendant's control, why did the thermostat effectively operate for seventeen years without fail? We simply cannot say that reasonable jurors could accept his premise.

Moreover, as presented to the motion judge, "it would amount to mere guess work to conclude ... that the defect ... of the [product] was attributable to the period of manufacture ... rather than [for instance] to possible subsequent misuse or overuse." *Jakubowski v. Minnesota Mining and Mfg., supra,* 42 *N.J.* at 187–88, 199 *A.*2d 826. Our mere recitation of the proofs, such as they were, bearing upon the history of the fryer's maintenance and repair, amply reflects this. *Compare Scanlon, supra,* 65 *N.J.* at 599–600, 326 *A.*2d 673 (no evidence of service record of alleged defective product, a nine-month old automobile with 4,000 miles, or examination thereof by the experts), with *Moraca, supra,* 66 *N.J.* at 458–60, 332 *A.*2d 599 (evidence that six-month old automobile with 11,000 miles had been properly serviced and maintained). *And see Navarro, supra,* 211 *N.J.Super.* at 577, 512 *A.*2d 507 (in light of evidence that oven latches had been in use daily for six years and had been maintained minimally, if at all, alleged defect in latches causing oven explosion could not reasonably be inferred to have existed while the product was in the control of the manufacturer).

We are fully cognizant that defense experts posited an entirely different factual scenario to explain the cause of the fire, that is, that the cook pot was not full of the fresh fat at the time of the fire. The theory as to the cause of the fire under this scenario was that, because the high-limit thermostat was not submerged in

the heating fat, the fat continued to heat, finally reaching its auto-ignition point and, thus, ignited. In that event, as we have pointed out, plaintiff's expert did assert that defendant, nonetheless, would have been responsible because such improper maintenance and/or use of the fryer should have been foreseen and, thus, the fryer should have been manufactured with a second, longer, high-limit thermostat that would have extended to the lowest point of the fryer. And we acknowledge that "whenever the facts permit an inference that the harmful event ensued from some defect (whether identifiable or not) in the product, the issue of liability is for the jury, and the plaintiff is not necessarily confined to the explanation his expert may advance." *Sabloff v. Yamaha Motor Co.*, 59 *N.J.* 365, 366, 283 *A.*2d 321 (1971). A design defect theory, if viable, would have avoided the manufacturer's control issue that became critical in the context of the manufacturing defect claim. *E.g. Scanlon v. General Motors Corp., supra,* 65 *N.J.* at 594, 326 *A.*2d 673.

And thus, during plaintiff's motion for reconsideration counsel, pointing out Blum's alternative design defect assertions, argued:

> So at the—the—while it is not the plaintiff's opinion, or the opinion of the expert witness of plaintiff that this is the way it happened, if the jury believes either through cross-examination of plaintiff's witness or through the co-defendant's witness who has indicated that the fire could have been caused the way—the scenario that I've given or possibly by an electrical fire, then the jury could infer that, in fact, it was a defect in the cook pot that caused the—the fire.

Since the design defect theory was premised on a theory of causation that Blum adamantly rejected, the motion judge queried how the alternative theory could be admissible during plaintiff's case and ultimately concluded:

> The plaintiff's expert has absolutely rejected Henny Penny's theory of—of causation. And he could not raise a material issue of fact now in plaintiff's case merely by making reference to it in his case and chief.
>
> At the end of the plaintiff's case we have to look at the plaintiff's evidence in the light most favorable to the plaintiff. He has absolutely rejected the defense theory of causation. Consequently, there would be no theory of causation that could implicate Henny Penny at the end of the plaintiff's case.

> Their theory of causation has been roundly and [soundly] rejected. I—I wonder whether, in fact, it would be admissible. Whether he would be allowed to make any reference to it. It may be a question of relevance.
>
> But even if he were allowed to make reference to it, he has already rejected it. And consequently, there will be no issue of fact—material issue of fact for a jury to consider.
>
> And therefore, the—the motion has to be denied. Motion for reconsideration is denied.
>
> And it's an interesting approach, frankly . . . [B]ut in looking at it, it has caused me to look at these in a different way. It still has to be denied.

We tend to agree with Judge Fuentes' careful and thoughtful analysis of the approach plaintiff sought at that point in the litigation. *See Corcoran v. Sears Roebuck and Co.,* 312 *N.J.Super.* 117, 126–28, 130–31, 711 *A.*2d 371 (App.Div.1998).

But beyond this, and perhaps more critically, Blum's alternative theory of design defect could not have survived a motion for involuntary dismissal as Blum never offered an opinion that his high-limit thermostat design was a "reasonably feasible alternative" design. *Smith v. Keller Ladder Co., supra,* 275 *N.J.Super.* at 284, 645 *A.*2d 1269 (quoting *Macri v. Ames McDonough Co., supra,* 211 *N.J.Super.* at 641, 512 *A.*2d 548). *See Lewis v. American Cyanamid Co.,* 155 *N.J.* 544, 571, 715 *A.*2d 967 (1998); *O'Brien v. Muskin Corp., supra,* 94 *N.J.* at 184, 463 *A.*2d 298; *N.J.S.A.* 2A:58C–3(a)(1) (a manufacturer may not be held liable on a products liability design defect theory "if . . . [a]t the time the product left the control of the manufacturer, there was not a practical and technically feasible alternative design" that would have prevented the harm). *And see Restatement (Third) of Torts* § 2(b) comment f (1998) ("[t]he necessity of proving a reasonable alternative design as a predicate for establishing design defect is, like any factual element in a case, addressed initially to the courts. Sufficient evidence must be presented so that reasonable persons could conclude that a reasonable alternative could have been practically adopted.").

The mere statement, here, that the cook pot should have had two high-limit thermostats, one of which would extend to the bottom of the cook pot, does not provide any basis for concluding

that such a design, though obviously simple in concept, would work. Without further explanation, the initial thought might be that such a design would result in a shut down of the cook pot every time it was heated, as the sensor bulb of the longer thermostat would be very close to the heating source. There may well be a technologically feasible and practical alternative design that would incorporate two high-limit thermostats, one of which would extend to the bottom. But the point is, Blum's almost oft-handed assertion that that is what the cook pot should have had does not provide any basis for a finder of fact to conclude that such a design was reasonably feasible in 1976.

We add one final comment. When presented with this concern during oral arguments, plaintiff's response was that because of the granting of the motion for summary judgment and denial of the motion for reconsideration, plaintiff was deprived of an opportunity to establish a basis for the alternative design defect theory. But our recitation of the facts and procedural posture of the case at the point of these motions makes clear that the motions occurred after Blum had not only submitted his original report, but had been deposed and had submitted several supplemental reports, and after defendant's expert also had been deposed. The alternative factual scenario for the fire posited by the defense, and which caused Blum to suggest the design defect theory as an alternative basis for liability, was in the case long before the motions.

Affirmed.